```
MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

HARTLEY M. K. WEST (CABN 191609)
PHILIP J. KEARNEY (CABN 114978)
Assistant United States Attorneys
    450 Golden Gate Ave., Box 36055
    San Francisco, California 94102
    Telephone:  (415) 436-7200
    Fax: (415) 436-7234
    E-Mail: hartley.west@usdoj.gov
            philip.kearney@usdoj.gov

Attorneys for Plaintiff
```

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>STEPHEN TANABE,<br><br>    Defendant. | No. CR 11-0941 CRB<br><br>**UNITED STATES' PRETRIAL CONFERENCE STATEMENT AND TRIAL MEMORANDUM**<br><br>Pretrial Conf.:  June 18, 2013<br>Time:  2:30 p.m. |

The United States of America, by and through its counsel of record, Melinda Haag, United States Attorney, and Hartley M. K. West and Philip J. Kearney, Assistant United States Attorneys, hereby submits its Pre-Trial Conference Statement and Trial Memorandum in the above-captioned case.

## I.  STATEMENT OF FACTS

**A.    The Indictment and Subsequent Proceedings**

On December 15, 2011, a federal grand jury sitting in San Francisco returned a four-count Indictment charging the defendant, Stephen Tanabe, with extortion under color of official right and conspiracy to commit the same, in violation of 18 U.S.C. § 1951.  The case was assigned to

U.S. PRETRIAL CONF. STATEMENT & TRIAL MEM.
CR 11-0941 CRB

the Honorable Saundra Brown Armstrong.  On April 26, 2012, the grand jury returned a Superseding Indictment, adding three counts of honest services fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and one count of honest services fraud conspiracy, in violation of 18 U.S.C. § 1349.  The government has agreed to dismiss the honest services fraud conspiracy count.

Defendant has agreed to proceed by Superseding Information, which will delete this conspiracy count; delete an aiding and abetting theory in one of the substantive extortion counts, proceeding instead solely on the theory that Tanabe was the principal; and cure a mistake in reference to counts underlying the forfeiture allegation.  The United States will file this Superseding Information on June 12, 2013.

The Superseding Information alleges that, beginning no later than November 2, 2010, and continuing through at least January 14, 2011, "TANABE and others engaged in an illegal scheme and conspiracy to defraud others by depriving them of their rights to his honest services as a Deputy Sheriff."  (S.I. ¶ 2.)  Specifically, it alleges that Tanabe participated in three "stings" with a private investigator named Christopher Butler.  (S.I. ¶¶ 3-4.)  Butler, the Superseding Information explains, conducted stings of husbands and ex-husbands for female clients involved in divorce, child custody, and other family law disputes.  (S.I. ¶ 3.)  In cases in which the clients advised Butler that the targets had a tendency to drink and drive, Butler would arrange for an undercover employee to meet the target at a bar, direct the employee to entice the target to drink alcohol until he was intoxicated, and have a police officer waiting outside the bar to stop and arrest the target for DUI.  (S.I. ¶ 3.)

As for Tanabe's role, the Superseding Information alleges that, in two stings, he waited outside the bar for the targets to exit and then stopped the targets shortly after they drove off.  (S.I. ¶ 4.)  In the third sting, Tanabe arranged for another Deputy Sheriff to wait outside the bar, while he remained inside the bar with Butler, monitoring the target's alcohol intake.  (S.I. ¶ 4.)  The Superseding Information goes on to allege that, "[i]n exchange for TANABE making DUI arrests and arranging for another officer to make an arrest, [Butler] compensated TANABE with cocaine and a firearm."  (S.I. ¶ 5.)

/ / /

Finally, as part of the scheme, the Superseding Information alleges that Tanabe and Butler exchanged text messages that traveled interstate "regarding coordination of the arrests and TANABE's compensation for his role in the arrests." (S.I. ¶ 6.) Specifically, Count Two alleges a text message on November 3, 2010, from Tanabe to Butler stating "I thought I worked it off last night." Count Three alleges a text message on January 9, 2011, from Butler to Tanabe, stating "They are up + heading for the door." Count Four alleges a text message on January 14, 2011, from Butler to Tanabe, stating "He's wasted." (S.I. ¶ 10.)

On July 16, 2012, Tanabe moved to dismiss all of the counts in the Superseding Information for failure to state an offense. Judge Armstrong denied the motion in its entirety on November 19, 2013. On February 8, 2013, the case was reassigned to this Court and, shortly thereafter, set for trial on June 24, 2013.

**B.     Proof Anticipated at Trial**

    1.     <u>Background</u>

The government intends to introduce evidence that Stephen Tanabe was a Deputy Sheriff with the Contra Costa County Sheriff's Office from November 2006 until March 2011, and that he was assigned to patrol in Danville, California for the last year of his employment. Tanabe met Chris Butler when he worked for Antioch Police Department from July 1995 to August 1997.

    2.     <u>The Stings</u>

        a.     <u>Bauldry Sting</u>

The government will offer documentary and testimonial evidence that, on or about October 20, 2010, Mona Daggett hired Chris Butler, the owner of a private investigation firm called Butler & Associates, to do a DUI "sting" of her ex-husband, David Lane Bauldry. Butler and individuals working for him will testify that they arranged for two attractive women to meet Bauldry at Meenar's Bar in Danville on November 2, 2010. After sharing drinks and discussing intimate plans for the evening, the women told Bauldry to follow them in his car. At Butler's instruction, the women sped off. Bauldry tried to keep up but was pulled over by the Deputy Sheriff Tom Henderson, who had been contacted by Tanabe, and arrested for DUI after a blood-alcohol test showed him to be over the legal limit.

The government will offer Tanabe's statements in an interview with the Sheriff's Office, in which he admitted that Butler called and invited him to meet at Meenar's bar while Butler was conducting surveillance on Bauldry. Tanabe said that he did join Butler at the bar and, since he was off-duty, he called Deputy Henderson to make the arrest. Tanabe asked if Henderson wanted a DUI arrest and gave him a description of Bauldry's car. Tanabe further stated that Bauldry was a "shit bag" and that his ex-wife wanted custody of the kids. Tanabe's cell phone records confirm numerous calls to Henderson between 9:26 PM and 10:43 PM.

Henderson will confirm that he got a call from Tanabe on November 2, 2010, asking if he wanted a DUI arrest. He will testify that Tanabe explained he was at Meenar's Bar with his "PI friend," and that they were watching a guy who was getting drunk. Henderson advised that he told Butler he would not do a "dirty stop," but would only stop Bauldry on probable cause. Tanabe called Henderson multiple times, reporting on Bauldry's sobriety status and giving Henderson a description of Bauldry's vehicle. When Henderson arrived at the bar where Tanabe was, he saw two cars speed past him; the second car was the one Tanabe had described. As Henderson stopped the second car, Deputy Robert Durrer arrived. Durrer conducted a DUI investigation and arrested Bauldry. Henderson will testify, during the stop, Tanabe drove up with a passenger in his car and advised that Bauldry was "being targeted because he is a real dirt bag and was cheating on his wife."

      b.    <u>Aksu Sting</u>

Through testimony from Butler and his employees, as well as documentary evidence, the United States will prove that Hasan Arda Aksu's wife hired Butler to arrange a DUI sting for her use in child custody proceedings. Butler employee Carl Marino – who was tasked with leading the Aksu sting – will testify that Butler told him that the sting should take place in Danville on a night when Tanabe was working, and warned Marino to make sure that Aksu "had enough." According to the plan, Marino pretended he was a reporter interviewing Aksu about influential immigrants in the East Bay. Marino arranged the interview to occur the evening of January 9, 2011, at The Vine at Bridges, a wine bar in Danville, and together with another Butler associate, provided Aksu with several flights of wine.

The government will again introduce Butler's texts with Tanabe, asking if Tanabe is working, advising that they "will be trying that DUI again tonight," and informing Tanabe later that evening that "They are up + heading for the door." At 9:39 PM, Tanabe texted "That them?" Butler responded "Call me."

The government will further introduce Tanabe's incident report regarding Aksu's DUI arrest. In this report, which shows that he stopped Aksu at 9:42 PM, Tanabe stated that he was "on routine patrol" in Danville when he observed a car pulling out of the driveway of The Vine and speeding off. Records show that Aksu was over the legal blood alcohol limit.

        c.      <u>Katz Sting</u>

The government will introduce exhibits and witness testimony to show that, on November 23, 2010, Alicia Spenger Katz retained Butler to investigate her husband, Mitchell Katz. Butler's case file shows that she paid approximately $3,000 for a DUI sting, which occurred on January 14, 2011. At the time, Katz and Alicia were going through a bitter divorce and custody battle.

As with the Aksu sting, witnesses will testify that Butler tasked Marino with operating the sting, instructing him to do it on a day when Tanabe was working. Marino was to play a TV producer who was pitching a reality show about Livermore winemakers. He set up a meeting with Katz, again at The Vine. After several flights of wine, Katz attempted to drive home, but was stopped by Tanabe shortly after leaving the bar. His blood alcohol level exceeded the legal limit, and Tanabe arrested him.

Bill Howard, who was then a Reserve Deputy Sheriff and riding with Tanabe on patrol that night, will testify that he heard Tanabe receive numerous calls prior to the arrest on Tanabe's personal cell from someone whom Tanabe identified as his "PI friend." He heard Tanabe get updates about the sobriety of someone who was drinking at a local wine bar, and get a description of the truck the person was driving, and then get an estimate for when that person would be driving. Howard will testify that Tanabe drove to the wine bar, found the truck, parked in a nearby hidden area, watched, and waited. As an individual left the bar and walked toward the truck, Howard heard Tanabe verify with the caller that the individual was the "intended

target." When Howard asked Tanabe what was going on, Tanabe said they were about to do "a dirty DUI" on Katz. Howard will further testify that, after Tanabe arrested Katz, Tanabe stated that the "whole thing was a set up," and that Katz needed to be "dirty" for a future custody battle.

Butler's cell phone shows the following texts to and from Tanabe on January 14, 2011:

> 7:31 PM (Outgoing from Butler): You out on the street yet??
>
> 7:56 PM (Outgoing from Butler): Hello......
>
> 9:42 PM (Incoming from Tanabe): How many?
>
> 9:42 PM (Outgoing from Butler): He's wasted
>
> 10:47 PM (Incoming from Tanabe): Call me
>
> 11:21 PM (Incoming from Tanabe): Im getting good at these, already 10 8
>
> 11:22 PM (Outgoing from Butler): Almost as good as I was!
>
> 11:25 PM (Incoming from Tanabe): U were the king

Law enforcement witnesses will explain that "10 8" means "back in service" or "back on duty."

The government will also introduce a certified copy of Tanabe's incident report for Katz's DUI arrest, in which Tanabe states that he was on "routine patrol" when he saw Katz's truck swerve, turn without signaling, and speed. Howard will explain that their waiting outside the bar for over an hour was absolutely not routine.

### 3. The Pay-Offs

#### a. The Cocaine

Butler will explain that he compensated Tanabe for arranging the Bauldry stop with an "eight ball" of cocaine (0.35 grams). He will testify that Tanabe initially asked to be paid $200 for participation in the Bauldry arrest, but later asked for the cocaine instead. Butler will further testify that he asked one of his decoys, Jordi Simms, to procure the cocaine, and that he gave the cocaine to Tanabe in the parking lot of Lunardi's Market, while Tanabe was on duty, in full uniform, driving his patrol car.

The United States expects Simms to testify that Butler asked her to get cocaine for a friend but did not say whom, that she bought the cocaine in San Francisco, and that she gave it to Butler.

The government will also offer toll records and images of text messages from Butler's cell phone. Butler's cell phone shows a 2 minute, 19 second call to Simms the night of Bauldry's arrest, followed by a 59 second call to her at 7:43 AM the next day, on November 3. Beginning at 9:43 AM on November 3, Butler had the following text message exchange with Tanabe:

> 9:43 AM (Incoming): Don't forget me.
> 9:46 AM (Outgoing): I made the call. She will tell me the price later 2day
> 9:47 AM (Incoming): I thought I worked it off last night
> 9:49 AM (Outgoing): You did. This is for my end. She cannot get it today due to her source is in SF and the parade has gridlocked the city
> 9:49 AM (Incoming): K let me know

At 1:08 PM, Butler received a 2 minute, 36 second call from Simms. Then he exchanged the following texts with Tanabe:

> 3:47 PM (Outgoing): I will have it 2morrow...
> 4:36 PM (Incoming): Cool.

On November 4, Butler exchanged more texts with Tanabe:

> 9:57 AM (Incoming): What time?
> 9:58 AM (Outgoing): The time is 10:57AM
> 9:58 AM (Incoming): Ha ha
> 10:00 AM (Outgoing): She will be getting together w me later today
> 10:00 AM (Incoming): I'll come by after work
> 2:04 PM (Incoming): U at the office? I'm off in the next hour.

At 2:05 PM, Butler texted Simms "Can we meet up today?" At 2:40, Simms responded that she could not, but would be able to the next day. The following day, on November 5, Simms and Butler discussed when to meet up. At 3:02 PM, Tanabe texted Butler that he would start work at 6:00. At 3:19 PM, Butler texted Simms that he could meet her in Danville at 7:00 PM. Simms called Butler at 4:01 PM, and Butler called Tanabe at 4:05 PM.

In addition to this evidence, the government will introduce Tanabe's admission, made in an interview with the FBI and the U.S. Attorney's Office, that he met Butler in Lunardi's parking

lot and that they did indeed pull their cars up close to each other.  It will also introduce his purported explanation – that they met for Butler to tell him that one of his employees, Sharon Taylor, did not want to sell him a gun.  The government will further introduce testimony from Taylor that, while at some point Tanabe discussed her selling him a gun, she knows that did not happen until she resumed employment with Butler & Associates, some time after November 5.

The government will offer Tanabe's interview statement in which he denied ever having used cocaine, and will seek to admit testimony from a former Butler employee, Karin Snoddy, who will state that she knows otherwise.  Specifically, she will testify that she dated Tanabe briefly in approximately 2002, that he asked her to buy him some cocaine, that she did so, and that she watched him use it.  This evidence, for which the government has provided notice pursuant to Federal Rule of Evidence 404(b), is relevant to prove Tanabe's motive in participating in the Bauldry DUI sting.  It is also relevant to show Tanabe's consciousness of guilt.

          b.      <u>The Glock</u>

Butler will testify that Tanabe offered to do as many DUIs as Butler wanted in exchange for a Glock handgun that Butler had received for use in a reality show.  At the time, Butler & Associates was involved in the filming of a show known as "P.I. Moms," and Glock had offered to provide the participants with guns in exchange for promotion, as a Glock representative will explain.  Butler will state that he gave Tanabe one of the Glocks as compensation for both the Aksu and Katz stings, after he and Tanabe went together to pick up the gun from a gun store.

The government will offer witnesses and records to show that, during execution of a search warrant in Tanabe's house, law enforcement officers found a Glock handgun in a safe in Tanabe's closet, and that this gun was registered to Butler.  Gun store records will show that Butler picked up the gun on January 15, 2011 – the day after the Katz sting – at approximately noon.  Text messages from Butler's cell phone show a text from Tanabe shortly before, stating: "what's up? what time you wanna go?"

/ / /

/ / /

4. <u>The Interstate Wire/Affect on Interstate Commerce</u>

The wires underlying the honest services fraud charges are text messages between Butler and Tanabe sent in furtherance of the stings and pay-offs. Count Two charges the text from Tanabe to Butler at 9:47 AM on November 3, 2010, stating "I thought I worked it off last night," sent in response to Butler advising Tanabe that he had "made the call" to Simms regarding the cocaine and would be learning "the price later 2day." Count Three charges the text from Butler to Tanabe on January 9, 2011, stating "They are up + heading for the door," advising Tanabe to get ready to pull Aksu over. Count Four charges the text from Butler to Tanabe on January 14, 2011, stating "He's wasted," again advising Tanabe that Katz was ready to be stopped for DUI.

For each text, the evidence will show that the sender was in California. A Sprint representative will testify that all of the texts passed through Kansas City, Missouri.

Moreover, a Glock representative will testify that the Glock found in Tanabe's closet, was manufactured outside of the state of California.

5. <u>Consciousness of Guilt</u>

The government will also offer testimony of former Reserve Deputy Howard to explain that, on the evening of February 16, 2011 – the day Butler was arrested on drug and other charges, along with former Central Contra Costa County Narcotics Enforcement Team Commander Norman Wielsch – Tanabe called him at home and arrived at his house shortly thereafter. According to Howard, Tanabe announced that Butler had just been arrested and expressed concern that his own phone calls were being intercepted, that authorities would see he had been in close communication with Butler, and that his house would be searched due to the DUIs. Howard will describe Tanabe's statements that he intended to explain away the phone calls with Butler, that he thought he was going to be punished, and that he told his wife how to behave if there is a search warrant. Finally, Howard will testify that Tanabe asked to leave a gun at Howard's house, saying that he did not want authorities to find it if Tanabe's house was searched. The gun was an assault rifle, and Tanabe's possession of it was illegal under California law.

///

**II.  JENCKS, BRADY, AND GIGLIO DISCLOSURE (Crim. L.R. 17.1-1(b)(1-3))**

The United States has fully complied with the *Jencks* Act, 18 U.S.C. § 3500, and believes it has supplied all materials that may be relevant under *Brady v. Maryland*, 373 U.S. 83 (1963).

The government has specifically requested that the two non-federal agencies closely associated with this investigation – the California Department of Justice, Bureau of Narcotics Enforcement (BNE) and the Contra Costa County Sheriff's Office – produce to the United States all evidence previously in their possession or control regarding Stephen Tanabe, Chris Butler, Carl Marino, and other Butler & Associates employees, as well as the DUI stings and CNET investigation generally, including all physical evidence, documentary records, and reports of interviews.  BNE and the Sheriff's Office have assured the United States that they have done so.

In addition to its routine discovery production, the government has provided the defense with access to all evidence relating to the Butler/Wielsch investigation, housed in a room at the FBI, due to the voluminous nature of the materials.  Defense counsel spent two days reviewing these materials, made copies of numerous items onsite, and has requested copies of additional items, which the government is providing.

In preparing for trial, the government is continuing to interview witnesses and obtain additional evidence.  The government recognizes and will comply with its ongoing obligation to provide the defense with materials subject to *Jencks*, *Brady*, and *Giglio v. United States*, 405 U.S. 150 (1972), that are within its possession, custody or control, as well as its continuing duty to comply with Rule 16.

As of this date, the United States is not aware of any material exculpatory or impeachment information concerning the witnesses expected to testify in its case in chief that would be subject to disclosure pursuant to *Brady*; *Giglio*; *United States v. Bagley*, 473 U.S. 667 (1985); and/or *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).

**III.  STIPULATIONS (Crim. L.R. 17.1-1(b)(4))**

The parties have agreed in principle to several stipulations and are in the process of fine-tuning the language.  Specifically, the parties will stipulate to the authenticity of various records; that the Glock recovered from Tanabe's closet was registered to Butler; the blood alcohol content

of the sting targets at the time of their arrests; and the existence of a Giants parade in San Francisco on November 3, 2010, with a scheduled start time of 11:00 AM.

The parties will attempt to reach additional stipulations in the interest of streamlining the trial. The United States anticipates that it will enter into several other factual and evidentiary stipulations with the defendant, which the parties will present to the Court at the pretrial conference.

### IV. NEED FOR INTERPRETERS (Crim. L.R. 17.1-1(b)(5))

The government will not need interpreters for any witnesses it intends to call.

### V. DISMISSAL OF COUNTS/ELIMINATION OF ISSUES (Crim. L.R. 17.1-1(b)(6))

The government is eliminating the charge of conspiracy to extort under color of official right in the Superseding Information.

### VI. JOINDER/SEVERANCE (Crim. L.R. 17.1-1(b)(7))

There are no joinder or severance issues.

### VII. INFORMANTS/PRIOR CONVICTIONS (Crim. L.R. 17.1-1(b)(8))

There are no informant issues in this case. The defendant has no prior convictions.

### VIII. WITNESSES (Crim. L.R. 17.1-1(b)(9))

While parties to a criminal case cannot be required to file a witness list, *United States v. Hicks*, 103 F.3d 837, 841 (9th Cir. 1996), the United States will do so prior to the Pretrial Conference. The United States reserves the right to call additional witnesses.

### IX. EXHIBITS (Crim. L.R. 17.1-1(b)(10))

The United States will provide the defendant with its anticipated exhibit list at or before the Pretrial Conference and reserves the right to supplement the list as needed. All exhibits will be drawn from materials that the government has provided to the defense in discovery.

The government will move to exclude any evidence offered by the defendant in his case-in-chief that is not produced prior to trial. *See United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (affirming district court's exclusion of checks that were not produced by defendant to the government prior to trial); *United States v. Nash*, 115 F.3d 1431, 1439-40 (9th Cir. 1997) (affirming exclusion of defense expert who was not properly disclosed pursuant to Fed. R. Crim.

P. 16(b)(1)); *United States v. Aceves-Rosales*, 832 F.2d 1155 (9th Cir. 1987) (per curiam) (affirming district court's exclusion of medical report not produced by defendant).

## X. OBJECTIONS TO EXHIBITS OR TESTIMONY (Crim. L.R. 17.1-1(b)(11))

The parties have filed and are filing motions *in limine* to address objections to expected exhibits and testimony, to the extent they cannot be resolved by the parties.

## XI. LEGAL ISSUES LIKELY TO ARISE AT TRIAL (Crim. L.R. 17.1-1(b)(12))

The parties have discussed a number of legal issues, which they have dealt with through motions *in limine* and in their proposed jury instructions. In particular, the government anticipates three contested legal issues: admissibility of "other acts" evidence regarding Tanabe's prior use of cocaine and his known ability to obtain illegal drugs from Butler; admissibility of "other acts" evidence of government witnesses; admissibility of other, unrelated DUI stings conducted by Butler; admissibility of evidence that Tanabe asked Howard to hide an illegal gun in his house as evidence of Tanabe's consciousness of guilt; admissibility of Tanabe's proposed cell phone expert; and the propriety of jury instructions regarding Tanabe's purported lawful authority defense.

## XII. SCHEDULING (Crim. L.R. 17.1-1(b)(13))

The Court scheduled Tanabe's jury trial for June 24, 2013, with jury selection occurring on June 20, 2013. A reasonable estimate for presentation of the government's case-in-chief is five days. One of the government's witnesses is unavailable until Monday, July 1, 2013, and the government expects that this witness will be among the final witnesses in its case-in-chief.

## XIII. JURY VOIR DIRE (Crim. L.R. 17.1-1(b)(14))

The parties are filing separately jointly proposed voir dire questions. The government also requests that it have some time to conduct individual voir dire.

## XIV. JURY INSTRUCTIONS (Crim. L.R. 17.1-1(b)(14))

The parties are filing separately jointly proposed jury instructions.

///

///

///

## XV.  OTHER ISSUES (Crim. L.R. 17.1-1(b)(15))

The Superseding Information contains a criminal forfeiture allegation.  This allegation alleges that upon conviction of the extortion charges, the defendant shall forfeit "any property, real or personal, which constitutes or is derived from proceeds traceable to said offense," pursuant to 18 U.S.C. § 981(a)(1)(c); 28 U.S.C. § 2461; and Rule 32.2 of the Federal Rules of Criminal Procedure

### A.    Criminal Forfeiture Procedure

The criminal forfeiture process is set forth in Rule 32.2 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 982, and 21 U.S.C. § 853.  Forfeiture is mandatory upon conviction of the charged offenses. *See* 18 U.S.C. § 982(a)(2) and (a)(6)(A)(ii)(II).  Rule 32.2 provides that as soon as practicable after a verdict of guilty on any count for which forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.  In either case, the government's burden of proof is by a preponderance of the evidence.  *United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense, but only an additional penalty).

Upon a party's request in a case in which a jury returns a guilty verdict for an offense that gives rise to forfeiture, the jury must determine whether the government has established the requisite nexus between the property and offense giving rise to forfeiture.  Fed. R. Crim. P. 32.2(b)(4).  Absent an explicit waiver by the defendant, the jury's nexus determination should be made in a separate phase from the guilt/non-guilt phase to avoid any confusion over the different burdens of proof.  *See* Advisory Committee Notes to 2000 Adoption of Federal Criminal Rule 32.2(b); *see also United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998).

/ / /

/ / /

      The jury itself does not order forfeiture, determine ownership, or consider third-party claims. *See* Fed. R. Crim. P. 32.2(b), (c). The only issue for the jury is to determine whether the Government has established the "requisite nexus between the property and the offense" on which the defendant has been convicted. Fed. R. Crim.P. 32.2(b)(1). In this regard, the government is submitting proposed jury instructions and a proposed special verdict form. The jury's special verdict will serve as the basis for this Court to enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b)(2), (3). The final order of forfeiture will follow notice and publication of the preliminary order and will address any third-party claims. Fed. R. Crim. P. 32.2(b)(2), (c).

      The jury does not consider whether the defendant has an interest in the property to be forfeited; nor does the jury determine the extent of the defendant's interest in any property to be forfeited. These matters are considered by the court in the ancillary proceedings, following the jury's special verdict and entry of the preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b), (c); Advisory Committee Note to Subsection (b).

      In determining whether the government has established the requisite nexus between the property sought for forfeiture and the offense of conviction, the trier of fact can rely on any evidence already in the record, or any evidence or information presented by the parties at a hearing after the verdict or finding of guilt, including hearsay. Rule 32.2(b)(1); *see also United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2nd Cir. 2007) (Rule 32.2(b)(1) allows court to consider "evidence or information" thus making it clear that court may consider hearsay). Once the trier of fact has found that the government has established the requisite nexus between the offense of conviction and the property sought for forfeiture, the court must promptly enter a preliminary order of forfeiture without regards to third parties' interest, if any, as that will be resolved in the ancillary proceeding. Rule 32.2(b)(2); *see also United States v. Nava*, 404 F.3d 1119, 1132 (9th Cir. 2005) (district court property instructed jury that questions of ownership "were not before them.").

///

**B.  Stipulated Agreement to Bench Trial on Forfeiture**

The parties have agreed that the Court, rather than the jury, should determine forfeitability. The Glock gun found in Tanabe's closet constitutes the only proceeds at issue. The government believes that a guilty verdict on Counts Three, Four, Six, or Seven necessarily constitutes a finding by the jury that the Glock was proceeds of a bribe paid by Butler to Tanabe.

DATED: June 11, 2013                                   Respectfully submitted,

                                                                               MELINDA HAAG
                                                                               United States Attorney

                                                                               /s/
                                                                             _____
                                                                               HARTLEY M. K. WEST
                                                                               PHILIP J. KEARNEY
                                                                               Assistant United States Attorneys