MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

HARTLEY M. K. WEST (CABN 191609)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6747
FAX: (415) 436-7234
Hartley.West@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR 11-0941 CRB |
| Plaintiff, | ) UNITED STATES' SENTENCING ) MEMORANDUM |
| v. | ) |
| STEPHEN TANABE, | ) |
| Defendant. | ) |

## I.   INTRODUCTION

On September 3, 2013, following a two week trial, former Contra Costa County Deputy Sheriff Stephen Tanabe was convicted of honest services fraud and extortion under color of official right arising out of his participation in three "dirty DUI" arrests in exchange for cocaine and a firearm. His sentencing is scheduled for February 19, 2014 at 10:00 a.m. The United States submits this Sentencing Memorandum to address the offense conduct and sentencing guidelines calculation, as well as to advise the Court of its sentencing recommendation: 42 months' imprisonment, three years' supervised release, a $600 special assessment, and forfeiture of the firearm obtained in connection with Counts Six and Seven.

U.S. SENTENCING MEM.
CR 11-0941 (CRB)

1

## II. DISCUSSION

### A. Offense Conduct

The Presentence Report (PSR) accurately summarizes the proof at trial regarding Tanabe's conduct.

Tanabe was a Deputy Sheriff in Contra Costa County, assigned to the Danville Police Station. His long-time friend, former police officer turned private investigator Christopher Butler, conducted stings of husbands and ex-husbands for female clients involved in divorce, child custody, and other family law disputes. In cases in which the clients advised Butler that the targets had a tendency to drink and drive, Butler instructed undercover employees to meet the target at a bar, directed them to entice the target to drink alcohol until he was intoxicated, and arranged for a police officer to wait outside the bar to stop and arrest the target for DUI.

#### 1. Bauldry Sting

In the first sting, Butler found out too late that Tanabe not on duty at the time of the sting he had arranged for target David Lane Bauldry, the evening of November 2, 2010. Tanabe advised Butler that he would find another officer to pull Bauldry over, and requested that Butler compensate him with $200 for doing so. When Tanabe met Butler at the bar to watch his attractive female employees enticing Bauldry to "do shots" with the suggestion he would later get lucky, Tanabe changed his requested compensation to an "8-ball" of cocaine. Butler was surprised because, while he knew Tanabe had a bad cocaine habit years before, he thought Tanabe had stopped using the drug before joining the Sheriff's Office. With the sting mid-course and looking promising, Butler agreed.

The morning after the successful sting, Tanabe texted Butler "Don't forget me." Approximately twenty seconds later, Butler called Jordi Simms, who testified at trial that Butler asked her to buy cocaine, that she did so from a source in San Francisco, and that she gave it to Butler. About one minute after the call to Simms, Butler texted Tanabe "I made the call. She will tell me the price later 2day." Tanabe responded, "I thought I worked it off last night." Butler advised, "You did. This is for my end. She cannot get it today due to her source is in SF and the parade has gridlocked the city." That afternoon, Simms called Butler; the call lasted approximately two and a half minutes. About half an

U.S. SENTENCING MEM.
CR 11-0941 (CRB)

2

hour later, Butler texted Tanabe "I will have it 2morrow…" Tanabe responded "Cool."

The next morning, Tanabe texted Butler "What time?" Butler stated "She will be getting together w me later today." Despite texts showing efforts to coordinate a meet that day, Sims and Butler ultimately agreed to meet the following evening, around 7:00 in Danville. At 7:01, Simms called Butler. She testified that she told him where she was, they met a couple minutes later, she handed him the cocaine, and he drove off. Butler testified to the same thing, and added that he then called Tanabe, drove to the parking lot of Lunardi's Market, where he and Tanabe pulled their cars up next to each other, and handed Tanabe the cocaine. Call records show Butler calling Tanabe at 7:05.

The case agent, FBI SA Marc Songsanand testified that, when he and the undersigned attorney interviewed Tanabe, he stated that his "Don't forget me" text and Butler's response "She will tell me the price later 2day" referred to an inquiry he had made to Butler about buying a gun from one of Butler's employees, Sharon Taylor. Tanabe explained his "I thought I worked it off last night" text as "a joke." Taylor testified that Tanabe had briefly talked to her about wanting to buy her gun at Butler's office, but she knew it could not have happened before November 10, 2010, when she resumed working for Butler.

2. <u>Aksu and Katz Stings</u>

Butler arranged the two other stings, of Hasan Aksu and Mitchell Katz, for times when Tanabe would be on duty. For both stings, Butler updated Tanabe through the course of the evening as to how many drinks the target had imbibed. Toward the end of the Aksu sting on January 9, 2011, Butler texted Tanabe, "They are up + heading for the door." During the Katz sting on January 14, 2011, Butler texted Tanabe, "He's wasted." For the latter sting, Tanabe was riding patrol with Reserve Deputy Sheriff William Howard. Howard testified that Tanabe told him before they even left the police station to go on patrol that they were going to "make a dirty DUI." During the evening, Howard told the jury, Tanabe got regular updates from his "PI friend," including descriptions of the target and his car, and that they waited – hidden – until the car drove down the street. At the station after Katz's arrest, Tanabe told him that Katz was involved in a custody battle and his wife wanted him to dirty him up with a DUI.

Butler testified that Tanabe told him he would do as many stings as Butler needed in exchange for a handgun that Butler had received from Glock in connection with the "P.I. Moms" reality show then

U.S. SENTENCING MEM.
CR 11-0941 (CRB)

3

being filmed.  At Tanabe's previously stated price of $200 per job, Butler calculated this would buy him three stings.  One of the "P.I. Moms" Glocks was found in Tanabe's closet during a search warrant, still registered to Butler.  Butler testified that he told Tanabe he would not switch the registration to Tanabe's name until he had worked it all off.

Agent Songsanand testified that, when interviewed by the FBI and the undersigned, Tanabe admitted he thought Butler owed him for the stings.  Tanabe's friend, Deputy Briggs testified that Tanabe showed him the Glock, said Butler had given it to him because Butler owed him money, and explained that the Glock was worth more than Butler owed him.  Deputy Nygard, another one of Tanabe's friends, testified that Tanabe told him he obtained the Glock "for helping his PI friend out."

**B.     Calculation of the Sentencing Guidelines**

The government concurs with the Sentencing Guidelines calculations set forth in the PSR, with upward adjustments for three groups, multiple acts of extortion, and obstruction of justice; no reduction for acceptance of responsibility; and a total offense level of 21.

### III.     ARGUMENT

**A.     Grouping**

The government agrees with the grouping determination in the PSR.  The Application Notes of the grouping guidelines describe the "victim" as the "one person who is directly and most seriously affected by the offense."  U.S.S.G. § 3D1.2(a), App. N. 2.  The note further provides that "Ambiguities should be resolved in accordance with the purpose of this section . . . to identify and group counts involving substantially the same harm."  *Id.*  While the people of Contra Costa County are generally harmed by Tanabe's conduct, depriving them of their right to his honest services, the sting targets are those most directly and seriously affected by the offense.  This would group together the conspiracy and Bauldry counts of conviction (Counts One and Two), the Aksu counts of conviction (Counts Three and Six), and the Katz counts of conviction (Counts Four and Seven).

While the government believes the above grouping best satisfies the goals of the applicable Guidelines, another alternative would be to group the honest services fraud counts (One through Four), and then the extortion counts (Six and Seven).  The victim of the first set would be the public of Contra

Costa County. The victim of the second set would be Butler, whom Tanabe extorted. *See* U.S.S.G. § 3D1.2(b) (grouping counts involving the same victim and two or more acts connected by a common criminal objective).

**B.      Multiple Acts of Extortion**

Tanabe contends that there is no evidence that Butler paid him cocaine for the Bauldry sting, and the only compensation Tanabe received is thus the Glock. Ample evidence as outlined above established that Tanabe demanded cocaine, and Butler agreed to procure it, in exchange for Tanabe's role in the sting.

While the jury acquitted Tanabe on Count Five, they convicted him on Count Two – deprivation of honest services in connection with the Bauldry sting. Both counts require proof of a bribe. Count Five alleged Hobbs Act extortion with regard to Bauldry's arrest, which required proof of: (1) Tanabe was a public official; (2) he obtained property, here cocaine in Count Five, that he knew he was not entitled to receive; (3) he knew that the property, specifically cocaine, was given in return for taking some official action; and (4) commerce or the movement of an article or commodity in commerce from one state to another was affected in some way.

Count Two alleged honest services wire fraud arising out of the same arrest. The elements of honest services wire fraud are: (1) Tanabe devised or knowingly participated in a scheme or plan to deprive the people of Contra Costa County of their right of honest services; (2) the scheme or plan consists of a bribe in exchange for Tanabe's services; (3) Tanabe owed a fiduciary duty to the people of Contra Costa County; (4) he acted with the intent to defraud by depriving the people of Contra Costa County of their right of honest services; (5) his act was material; that is, it had a natural tendency to influence, or was capable of influencing, a person's acts; and (6) Tanabe used, or caused someone to use, an interstate wire to carry out or to attempt to carry out an essential part of the scheme.

Although a bribe is an element of both charges, only Count Five also requires that the cocaine was given in return for taking official action. It is possible that the jury found this element not satisfied because Tanabe was not on duty at the time of Bauldry's arrest. We will never know exactly what their reason for acquitting was. We just know that they had to have found that Tanabe participated in a

scheme consisting of a bribe of cocaine in exchange for services, because that was required for conviction on Count Two.

## C. Obstruction of justice

The obstruction enhancement applies. Tanabe did not just forget facts or speak out of confusion when he told the FBI and the undersigned during an interview that his "Don't forget me" text to Butler and Butler's response "she will tell me the price later 2day" – both the morning after the Bauldry arrest – related to Taylor's Glock. Nor was he innocently mistaken when he told the FBI and government counsel that his text "I thought I worked it off last night" was just a joke. These are flat lies.

Nor is there speculation in concluding that Tanabe obstructed the investigation in deleting text messages. Butler's cell phone at the time of his arrest in February 2011 contained the above-described texts with Tanabe, as well as those coordinating the day and time for them to meet up for what the evidence at trial proved to be the cocaine hand-off, and numerous texts leading up to and following the Aksu and Katz stings. Tanabe's cell phone contained texts back to December 2010 (after Bauldry arrest but before Aksu and Katz arrests). However, it contained no texts with Butler, indicating that Tanabe deleted them prior to his phone being seized on the day of his arrest. Indeed, when interviewed by Probation, Tanabe conceded having deleted the texts with Butler.

## D. Acceptance of responsibility

Tanabe urges he should still get credit for acceptance under 3E1.1(a). This is not a rare situation where a defendant admits responsibility but still goes to trial. His whole defense was that he did not take a bribe or do anything wrong. The acceptance of responsibility adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, App. N. 2.

Here, Tanabe does not even express remorse, other than for the fact that he got caught and is likely to go to prison. Indeed, he continued to tell Probation that he was simply doing his job of protecting the people of Contra Costa. To the contrary, his conduct did not protect anyone. He knew and intended that Butler was going to let loose on the crowded streets of downtown Danville a driver

U.S. SENTENCING MEM.
CR 11-0941 (CRB)

6

whose intoxication Butler had orchestrated. He did not arrest the drunk target entering his car, or at least prevent the guy from driving. Instead, to avoid citing Butler as a source in his report, he let the target drive drunk for several blocks to develop independent probable cause. Then he lied in his reports and said he was on "routine patrol."

**E.     18 U.S.C. § 3553(a) Factors**

Title 18, United States Code, Section 3553(a) requires the court to "impose a sentence sufficient, but not greater than necessary" after considering "the nature and circumstances of the offense and the history and characteristics of the defendant"; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with training, medical care, or other correctional treatment; the Sentencing Guidelines; and the need to avoid unwarranted sentencing disparity between similarly situated defendants.

The nature and circumstances of these offenses are severe. A police officer – who took an oath to serve and protect the public, to act honestly, and indeed not to take bribes – lay in wait for drunk drivers in exchange for cocaine and a gun. He sold his badge for cheap, and he endangered the public he was sworn to protect. The endangerment of the public, together with Tanabe's continued inability to truly understand the severity of his offenses, leads the government to recommend a sentence in the middle of the applicable guideline range: 42 months. Such a sentence is the minimum necessary, too, to adequately promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

The government's recommendation takes into account Tanabe's history and characteristics, which do not involve extraordinary occurrences. The government does not dispute that Tanabe is a good father. Many criminal defendants are, and it is unfortunate for their children that their parents are criminals.

There are no sentencing disparity issues. Butler was sentenced to 96 months, after a downward departure for substantial assistance.

## IV. CONCLUSION

For the foregoing reasons, the United States asks the Court to sentence the defendant, Stephen Tanabe, to an imprisonment term of 42 months; a supervised release term of three years; $600 in special assessments; and forfeiture of the Glock firearm.

Date: February 13, 2014                                Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
_____
HARTLEY M. K. WEST
Assistant United States Attorney

U.S. SENTENCING MEM.
CR 11-0941 (CRB)