Alan Ellis
LAW OFFICES OF ALAN ELLIS
1299 Fourth Street, Suite 202
San Rafael, CA 94901
415-256-9775
415-256-9772 Fax
AELaw1@aol.com
Attorney for Defendant,
Stephen Tanabe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR-11-0941 SBA |
| Plaintiff, | ) **DEFENDANT STEPHEN TANABE'S** |
| v. | ) **SENTENCING MEMORANDUM** |
| | ) DATE:  February 19, 2014 |
| STEPHEN TANABE, | ) TIME:  10:00 am |
| Defendant. | ) Court:  Hon. Charles R. Breyer |

    Defendant Stephen Tanabe, pursuant to Federal Rule of

Criminal Procedure 32(b)(2), and by and through undersigned

counsel, respectfully submits the following memorandum in aid of

sentencing:

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................... 3

INTRODUCTION.................................................. 5

STEPHEN TANABE............................................... 6

ARGUMENT..................................................... 11

A.  Applicable Law. . . . . . . . . . . . . . . . . . 11

B.  The Guidelines Calculation. . . . . . . . . . . . . 12

C.  USSG §2C1.1 Should Not Be Given Any Significant Weight. . 25

     Figure 1 . . . . . . . . . . . . . . . . . . . .26

     Figure 2 . . . . . . . . . . . . . . . . . . . .27

     Figure 3 . . . . . . . . . . . . . . . . . . . .28

     Figure 4 . . . . . . . . . . . . . . . . . . . .29

D.  Factors That May Warrant A Sentence Below The Advisory
    Guideline Range. . . . . . . . . . . . . . . . . . 29

E.  A Non-Prison Sentence is Sufficient But Not Greater Than
    Necessary to Fulfill The Statutory Purposes of Sentencing 37

CONCLUSION................................................... 38

# TABLE OF AUTHORITIES

**Cases**

Gall v. United States, 552 U.S. 38 (2007)...................... 25

Nelson v. United States, 555 U.S. 350 (2009).................. 24

Pepper v. United States, 131 S. Ct. 1229(2011)............... 24

Peugh v. United States, _ U.S. _, 113 S. Ct. 2072, 2080 (2013) 24

Rita v. United States, 551 U.S. 338 (2007)................... 24

United States v. Booker, 543 U.S. 220 (2005)................. 12

United States v. Cantrell, 433 F.3d 1269 (2006).............. 11

United States v. Crawford, 407 F.3d 1174 (11th Cir. 2005)..... 12

United States v. Grasso, 724 F.3d 1077 (2013)................. 24

United States v. Kimbrough, 552 U.S. 85 (2007)............... 24

United States v. Lopez, 104 F.3d 1149 (9th Cir. 1997)........ 17

United States v. Mercado, 474 F.3d 654 (9th Cir. 2007)....... 15

United States v. Rhodes, 730 F.3d 727 (8th Cir. 2013)........ 13

United States v. Watts, 519 U.S. 148 (1997)................. 15

**Statutes**

18 U.S.C. § 3553(a)............................. 23, 26, 29, 37

28 U.S.C. § 944................................................ 35

**Other Authorities**

Retail Cocaine Prices in The United States,
  http://www.narcoticnews.com/Retail-Cocaine-Prices-in-the-
  United-States-of-America.php ............................... 13

Letter from AUSA Hartley West to Officer Goldsberry 2 (Nov. 14,
  2013) ...................................................... 17

Bureau of Justice Statistics, *Recidivism of Offenders on Federal
  Community Supervision* ..................................... 32

Sentencing Commission's Report Chapter Three Adjustments—Offender

Based (FY 2012) ............................................... 18

U.S. Sentencing Comm'n, Datafiles FY2007-FY2012.............. 38

U.S. Sentencing Comm'n, Preliminary Quarterly Data Report, 4th Q.

2013 Release ................................................ 37

U.S. Sentencing Comm'n, Transcript of Public Hearing (Feb. 16,

2012) ....................................................... 36

**Rules**

USSG §2B1.1.................................................. 37

USSG §2C1.1............................................. passim

USSG §2G2.2.................................................. 37

USSG §3C1.1.................................................. 18

USSG §3D1.2........................................ 16, 17, 23

USSG §3E1.1.................................................. 20

USSG §5C1.1.................................................. 23

USSG §5E1.2.................................................. 22

**INTRODUCTION**

The Court is strongly urged to sentence the Defendant to five years' probation conditioned upon service of six months of community confinement in a halfway house (two suitable facilities are located in Oakland and San Francisco) followed by six months of home confinement with electronic monitoring, and a significant amount of community service in a project that would combine Mr. Tanabe's talents and abilities with society's needs.  Undersigned counsel and Ms. Lopez would be pleased to work with the U.S. Probation Department in developing such a program.  No restitution is warranted and the Defendant does not have the ability to pay a fine.

Mr. Tanabe's offense conduct, while serious, nonetheless is far and away from the typical, or heartland, type of police officer misconduct.  What Mr. Tanabe did was to arrest drunk drivers, albeit not in the normal course of his duty, but in return for a Glock handgun worth $450.  Compared to other police misconduct undersigned counsel has witnessed and been made privy to during his 47 years at the Bar (planting evidence, beating involuntary and untruthful confessions out of innocent suspects, stealing drugs and money from dealers and evidence rooms, committing perjury on the witness stand, assaulting suspects, forced sex in exchange for not being arrested, etc.), Mr. Tanabe's behavior pales in comparison.

Mr. Tanabe was found not guilty of the charge of accepting

an eighth of an ounce of cocaine in exchange for arresting three individuals who in fact were guilty of driving under the influence of alcohol.  Consistent with the jury's verdict, Mr. Tanabe vehemently denies having received any such cocaine. Even if the Court believes Mr. Tanabe received cocaine as part of his offense conduct, because he was acquitted on that count, this Court nevertheless should decline considering it for purposes of calculating the guidelines sentencing range.

### STEPHEN TANABE

The Presentence Investigation Report (PSR) accurately describes Mr. Tanabe's offender characteristics and we have nothing to add at this point other than to note that he has led an exemplary life as a son, a step-brother, a husband and a father.  The letters submitted on his behalf describe a very loving son, deeply caring friend, extremely involved father and husband.  A letter from his step-sister, Kim Lar Rieu Sorenson, reproduced in Exhibit 1, includes:

> As I've watched Mr. Tanabe mature, he's proven to be a devoted family man and a selfless, dedicated father.  Like his dad, Mr. Tanabe's life has centered on the growth and development of his children.  When I see them embrace him with great affection, I recall his small hands wrapped just as tightly around his own dad.

> Like his predecessors, Mr. Tanabe has worked hard and persevered in the face of setbacks. Most recently when the opportunity to work as a Deputy Sheriff ceased, Mr. Tanabe remained resilient, committed to creating new ways to be the family provider.  He has been busy and resourceful, taking on new responsibilities

to meet their financial needs.

Despite the current turn of events that have
impacted their lives, Mr. Tanabe has helped
his eldest son stay focused in high school,
and pursue the goal of college. With Mr.
Tanabe's daily support, his son earned many
swimming awards and metals, maintained grades
that put him on the honor roll continually,
and received a swim scholarship to CalPoly,
where he has just started. During Mr.
Tanabe's entire time of investigation, Cody
continued to honor his father with love and
respect.

His son, Cody Tanabe, writes:

My Dad, Mr. Tanabe, is a courageous man, he
has fought for me in multiple custody battles
against my mom after their divorce. I finally
got to live with him almost full time from my
freshman year in high school to high school
graduation. I have grown and become more
knowledgeable as a man because of him. Even
after my parents' divorce and my mom gaining
a majority of the custody, my Dad stayed in
California even though his heart wanted him
to be in Hawaii, his home. He stayed for me,
even though my mom took him to hell and back.
He still stayed and I hope you can see how
devoted and special my Dad is to me and all
the people he loves.

In a letter from his wife, Jamie Tanabe, she notes:

They say that things happen for a reason, and
the only reason I can come up with is that
Mr. Tanabe has had 2 ½ years of uninterrupted
bonding with Makena. She loves her daddy,
cries for him when he is gone and calls for
him when she hears the garage door open. Mr.
Tanabe loved being a police officer, it was
his passion and I believe it was his calling
in life. He is a people person, a guy's guy,
and can connect with anyone. He stands up
for the underdog, fights for what is right
and loves his children more than anything. I
have always called him "my social butterfly"
and people have always wanted to be around
him. Now he is a convicted felon, and that
for him, is a life-sentence. He will have to

> check "that" box on every job application he
> fills out for the rest of his life.  We will
> all move on from this, we will put this
> behind us, we will learn from this, and we
> will prosper together as a family.

Mr. Tanabe was very well respected in his career by his

fellow officers.  Letters indicate that he worked hard, took

pride in his work, and helped many others along the way.

Additionally he was highly skilled and highly regarded.  Deputy

Robert D. Waldrop from the Contra Costa Sheriff's Office writes:

> For 26 years I have known Mr. Tanabe to be an
> outstanding man and law enforcement agent
> with fairness, integrity, high moral regard,
> and standards to his professions.  Mr. Tanabe
> has always been highly regarded by his fellow
> officers and deputies, who have worked beside
> him.  He has twice been selected for the
> highly competitive position of SWAT team
> officer, in both departments.  During the
> HPD academy, we needed to pass an ocean swim
> test.  I could not swim, but Mr. Tanabe
> assured me that it would be okay.  As I got
> ready to jump into the rough waters, Mr.
> Tanabe jumped in before me and waited till I
> jumped in.  He then helped me tread water and
> guided me back to the safe point.  I will
> always be grateful to him.  He has always
> been helpful and caring for his fellow man.

Former fellow Deputy Sheriff Contra Costa County James Argo

states:

> I have been a Deputy Sheriff with contra
> Costa County for 7 years.  I met Steve Tanabe
> when I first started out in my career and we
> immediately became close friends. Steve acted
> as a role model to many young Deputies,
> including myself.  I have worked with Steve
> in Multiple assignments throughout the
> Sheriff's Office and he always displayed a
> positive attitude and a strong work ethic.
>
> Steve is a loving Husband and Father.  He

> would do anything for his family and friends and expect nothing in return. He is one of the most selfless people I have ever known. I was shocked to hear what Steve was being accused of since it was so out of his character.

Mr. Tanabe is currently working as a private investigator. Cody Salfen, the owner of a private investigator firm who has employed Mr. Tanabe, notes:

> Mr. Tanabe's integrity and ability to handle matters are superior to nearly all of the other private investigators I have utilized. I can say with certainty that Mr. Tanabe's knowledge, skillset, attitude, work ethic, and ability to effectively handle investigations are second to none. Mr. Tanabe has an unprecedented ability to problem solve in an empathetic and effective manner. Not once have I called Mr. Tanabe's ethics, integrity, or professionalism into question. In even the most sensitive of matters, I have not hesitated to call on Mr. Tanabe for assistance. And, Mr. Tanabe has always come through and produced quality work product – a practice that is surprisingly and unfortunately rare in an industry primarily comprised of former local, state, and federal law enforcement officers. Instead of just showing up and putting in time, Mr. Tanabe works towards the end goal of solving the problem that exists. He does this because he cares about others and truly strives to help.

Mr. Salfen continues his letter with this rather interesting matter about Mr. Tanabe's services:

> Most recently, Mr. Tanabe has assisted on a missing person case. A father in Southern California retained my services to attempt to locate his adult son, who was a suspected drug (heroin) user living on the streets in San Francisco. As I formulated a plan to approach this matter, I called upon an associate that is a retired San Francisco

Police Department Inspector. This retired inspector dubbed this case a "proverbial needle in a haystack case" -- calling into question any realistic chance of locating the client's son. Mr. Tanabe proved the retired San Francisco Police Department Inspector wrong and, as usual, Mr. Tanabe's work product exceeded my realistic expectations for the ultimate resolution of the matter. Mr. Tanabe went above and beyond that which was requested of him and was able to effectively locate the needle in the haystack. That is, through Mr. Tanabe's efforts, the son has been located and the case continues to progress in the form of the father formulating an intervention plan. Mr. Tanabe's efforts in locating this individual provided much needed peace of mind to my client, in the form of a mother and a father knowing that their son had not fallen victim to the streets. But for Mr. Tanabe's efforts, the son would not have been located and the clients would not have such peace of mind through this past holiday season, knowing their son was alive.

Mr. Salfen also notes:

Most recently, Mr. Tanabe helped the victim of a fraud. Although he was unable to pay Mr. Tanabe more than money for his gasoline, Mr. Tanabe felt bad for this older man who lost $800,000 to a woman through fraud. He was destitute and needed help. Mr. Tanabe worked on the case for seven or eight months and finally located her son. Approximately three weeks ago, Mr. Tanabe located the female suspect working at a bowling alley in Concord. He verified the warrant through the Maricopa County District Attorney's Office and called Concord Police. Concord Police took her into custody and the victim and his family were very grateful to Mr. Tanabe and are hoping to recover some of the stolen money.

All of the quoted from letters are attached as Exhibit 1.

There are many additional letters with the common theme that

Mr. Tanabe deeply cares for his friends and family and is generous with his time and skills to others.

Mr. Tanabe understands he committed a crime and that he must be punished for his conduct.  He would like the Court to know that beyond any incarceration imposed, he has shattered his life-long dream of excelling in his police career.  Mr. Tanabe has received awards, commendations, earned the most desired positions within the department, and was "on the fast track".  See Exhibit 2 (Tanabe Resume and Letter of Commendation).  Since his arrest, he has supported and encouraged his son in starting his college path and has experienced the joy of a new daughter.   While it is always a tragedy for family members when a father goes to prison, Mr. Tanabe is particularly close to his two-year-old daughter who cries when he goes to work for a few hours.  She will be most impacted by any absence from the family, a reality that is almost too much for Mr. Tanabe to contemplate.  Considering the loss of his career and the devastation to his daughter, he is being punished quite substantially.

**ARGUMENT**

**A.   Applicable Law**

District courts are not mandated to sentence within an applicable guideline range because the Sentencing Guidelines now are advisory.  See United States v. Cantrell, 433 F.3d 1269, 1279 (2006) (citing United States v. Booker, 543 U.S. 220, 259-60 (2005)).  Although district courts "'must consult [the] Guidelines

and take them into account when sentencing,'" they retain "the discretion to impose non-Guidelines sentences." <u>Id.</u> (quoting <u>Booker</u>, 543 U.S. at 264).  With increasing frequency, judges are doing so, as discussed in detail below.

Moreover, while the Guidelines are simply advisory, "as was the case before <u>Booker</u>, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a district court 'effectively means that [the district court] has not properly consulted the Guidelines.'" <u>Cantrell, 433 F.3d</u> at 1280 (quoting <u>United States v. Crawford</u>, 407 F.3d 1174, 1178-79 (11th Cir. 2005)).

**B.   The Guidelines Calculation**

There are several errors in the final Presentence Investigation Report (hereinafter "PSR") that are addressed *seriatim*:

**Para. 12**: As the PSR correctly indicates, Mr. Tanabe was acquitted of Count Five, which involved an alleged payoff of cocaine.  As the Court is well aware, the jury found the evidence in support of the alleged cocaine transaction insufficient Indeed, there in fact was no credible evidence of the alleged cocaine payoff.  Furthermore, no actual cocaine ever was introduced into evidence at trial, and no drug test showing that Mr. Tanabe in fact was using cocaine at any relevant time.

The two primary witnesses regarding the cocaine transaction were co-defendant Chris Butler and Jordi Simms (a former employee of Butler's and apparently an on-again, off-again prostitute).

Butler testified that Tanabe, in lieu of $200 cash, asked Butler for an "8 ball" of cocaine and was testifying pursuing to a Rule 35 deal. See Trial Transcript (vol. 5) at 957, 973. Simms testified that Butler contacted her to obtain the cocaine and had an immunity deal with both the feds and the state. Id. at 1086-95.

While Butler has approximately 10 years' experience in law enforcement, and significant experience buying drugs on behalf of clients including cocaine (see id. at 955-56), Butler was unable to recollect how large an 8-ball of cocaine is (see id. at 956); an 8-ball is an extremely common unit of sale at the retail level of drug trafficking. See, e.g., United States v. Rhodes, 730 F.3d 727, 728 (8th Cir. 2013)("In drug parlance, an 'eight ball' is one-eighth of an ounce of an illegal drug, a common wholesale quantity."). Butler nonetheless repeatedly testified that it is .34 or .35 grams when in fact it is approximately 3.5 grams (or one-eighth of an ounce). See id. Thus, Butler's best estimate still was off by an order of magnitude.

Further, Butler testified that he paid Simms $200 to obtain the 8-ball. See Trial Trans. (vol. 5) at 1012. This is highly suspect inasmuch as according to many credible sources, an 8-ball of cocaine has a retail (or street) value of only $60 to $80 in the Bay Area. See, e.g., http://www.narcoticnews.com/Retail-Cocaine-Prices-in-the-United-States-of-America.php. Again, it strains credulity when an experienced purchaser of illicit drugs

not only is unaware of how much an 8-ball is in terms of weight, but also its cost.

Similarly, Simms was wholly unbelievable inasmuch as, *inter alia*, she testified that she in fact had misled DOJ during a key interview and therefore was in violation of her immunity deal. See Trial Transcript (vol. 5) at 1137.  Similar to Butler, not only did Simms not know how much an 8-ball was, but also did not know how much money she was given by Butler to make the purchase (from someone named David Soto), but also could not recall how much she paid Soto for the cocaine.  See id. at 1095-1104. Additionally, Simms testified that while she did purchase the cocaine from Soto, she did not actually see it since it was delivered in a closed enveloped which, apparently, was never opened.  See id. at 1105.  She testified she delivered the same envelope to Butler in this manner.  See id.  Thus, it is not even clear whether Simms in fact obtained cocaine from Soto let alone delivered cocaine to Butler.

It also is rather incredible that Mr. Tanabe would forgo $200 cash for $60 to $80 worth of adulterated street cocaine. Why not ask for two or three 8-balls?  This is especially incongruent with Mr. Tanabe's receipt of the Glock, which, per evidence introduced at trial, has a street value of $565 ($425 for law enforcement).  See id. at 1148, 1162.  Accepting a Glock in lieu of $200 cash is, on its face, a good deal; in contrast, asking for an 8-ball in lieu of $200 cash is at best naïve and,

at worst, stupid.

Thus, the above "evidence" clearly demonstrates why the jury acquitted Mr. Tanabe as to Count Five—not so much because the evidence did not prove the allegations beyond a reasonable doubt, but rather that there simply was no credible evidence that Mr. Tanabe ever received any cocaine as a bribe for the DUI arrests.

As noted in Mr. Tanabe's objection in the PSR at Paragraph 67, which is consistent with Mr. Tanabe's letter to this Court accepting responsibility for the offense he was convicted of (attached as Exhibit 3), Mr. Tanabe adamantly denies using cocaine since 1981 let alone asking for or receiving it as a bribe.  In short, the cocaine story lacks any indicia of reliability or credibility and accordingly, should not be used to enhance his sentence as discussed in more detail below.

Finally, the cocaine Mr. Tanabe allegedly received as a bribe plainly constitutes acquitted conduct in light of his acquittal on Count Five of the Information.  While the Court of Appeals for this Circuit has held that use of acquitted conduct to enhance a sentence does not violate the Sixth Amendment, United States v. Mercado, 474 F.3d 654, 656-57 (9th Cir. 2007)(citing United States v. Watts, 519 U.S. 148 (1997)), as the late Judge Fletcher recognized in her dissent in Mercado, "In Booker, the Court explained that Watts addressed only a 'very narrow' Fifth Amendment issue unrelated to the Sixth Amendment question then before the Court."  Mercado, 474 F.3d at 658

(citing Booker, 543 U.S. at 240 & n.4).  Accordingly, as it remains an open question with respect to Supreme Court jurisprudence, Mr. Tanabe objects to the use of acquitted conduct to enhance his sentence inasmuch as it violates the Sixth Amendment to the U.S. Constitution, and does so in order to preserve the issue.

**Para. 22**: As the PSR correctly notes, "the victims of this case are the citizens of Contra Costa County."  PSR at 6, ¶16. Further, the PSR also <u>originally</u> correctly observed "that the three targets of the DUI's [sic] [are] not legally considered let alone actual victims."  <u>Id.</u>[1]  Moreover, they were not even victims in the true sense of the word.  They were people who were known to have the propensity to drink and drive and they did so the night before they were arrested.  No one forced them to drink to a point where they were impaired and should not be driving. Even if they drank to excess, there is such a thing as a taxi.

Because the targets were not victims, all counts are to be grouped pursuant to USSG §3D1.2(a) inasmuch as there is one and only one victim—the citizens of Contra Costa County, i.e., the "societal interest."  <u>See</u> <u>United States v. Lopez</u>, 104 F.3d 1149, 1150 (9th Cir. 1997)(per curiam)(holding that "[v]ictimless

---

1 As to this sentence, the final draft of the PSR now reads "the three targets of the DUI's [sic], [are] not considered victims inasmuch as they are not eligible for restitution."  The undersigned is uncertain about why this particular change was made in the PSR—especially the omission of the term "legally"—nor what impact the change was supposed to have.  Under any view— "legally" or "[in]eligible for restitution"—the targets manifestly were not victims for Guidelines purposes.

crimes, such as those involved here, are treated as involving the same victim 'when [as here] the societal interests that are harmed are closely related'")(citing USSG §3D1.2, comment. (n.(2)); see also USSG §3D1.2 (indicating offenses covered by 2B1.1 and 2C1.1 are to be grouped).

The PSR, however, maintains that there are three distinct groups based on the three different targets. As these targets cannot be "legally considered victims" and otherwise are "not considered victims inasmuch as they are not eligible for restitution," *ipso facto* they cannot serve to create three distinct groups for guidelines purposes. Had Mr. Tanabe fabricated evidence of their intoxication, then perhaps *arguendo* the targets would have been victims, but that obviously is not the case here.

**Paras. 27, 33 & 38**: The Government invites the Probation Officer to assign an obstruction of justice enhancement based Mr. Tanabe's explanation of some text messages as referring to a Glock handgun, and the alleged deletion of other text messages. See Letter from AUSA Hartley West to Officer Goldsberry 2 (Nov. 14, 2013). Both these grounds simply invite the Probation Officer to speculate as to the circumstances surrounding the text messages, or absence thereof. And in all events, such invited speculation does not arise to a preponderance of the evidence in support of applying the application at USSG §3C1.1, especially

where, as here, the jury acquitted Mr. Tanabe of any conduct involving cocaine.  Further, as application note 2 to USSG §3C1.1 expressly states:

> A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision.  In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

USSG §3C1.1, comment. (n.(2)).  Mr. Tanabe therefore strongly disagrees that this enhancement applies.  Indeed, as the table below indicates, which were taken from the U.S. Sentencing Commission's Report Chapter Three Adjustments—Offender Based (FY 2012), the obstruction enhancement rightly is rarely applied in public corruption cases: a mere 7.5% of the time (or just 22 times in 295 public corruption cases in FY 2012).

## CHAPTER 3 ADJUSTMENTS Fiscal Year 2012

| Guideline and SOC | Applied | Percent |
|---|---|---|
| **Part C - Offenses Involving Public Officials** | | |
| §2C1.1 Offering, Giving, Soliciting, or Receiving a Bribe | 295 | 0.4 |
| §3A1.1(a) Hate Crime Adjustment (three levels) | 0 | 0.0 |
| §3A1.1(b)(1)&(2) Vulnerable Victim Adjustment (two or four levels) | 0 | 0.0 |
| §3A1.2 Official Victim Adjustment (three or six levels) | 0 | 0.0 |
| §3A1.3 Restraint of Victim Adjustment (two levels) | 0 | 0.0 |

| | | |
|---|---|---|
| §3A1.4 Terrorism Adjustment (12 levels, or increase to level 32) | 0 | 0.0 |
| §3B1.1 Aggravating Role Adjustment (two, three or four levels) | 25 | 8.5 |
| §3B1.2 Mitigating Role Adjustment (two, three or four level decrease) | 13 | 4.4 |
| §3B1.3 Abuse of Position of Trust Adjustment (two levels) | 8 | 2.7 |
| §3B1.4 Use of a Minor to Commit a Crime Adjustment (two levels) | 0 | 0.0 |
| §3B1.5 Use of Body Armor in Drug Trafficking or Crimes of Violence (two or four levels) | 0 | 0.0 |
| §3C1.1 Obstructing or Impeding the Administration of Justice Adjustment (two levels) | 22 | 7.5 |
| §3C1.2 Reckless Endangerment During Flight (two levels) | 0 | 0.0 |
| §3C1.3 Commission of Offense While on Release (three levels) | 1 | 0.3 |
| §3C1.4 False Registration of Domain Name (two levels) | 0 | 0.0 |
| §3E1.1 Acceptance of Responsibility (two or three level decrease) | 266 | 90.2 |

**Paras. 23, 30 & 36:**  The PSR adds two levels to the 14-level
Base Offense Level pursuant to USSG §2C1.1(b)(1).  Mr. Tanabe
objects to this two-level enhancement inasmuch as there in fact
only was one bribe, specifically, the one regarding the Glock
pistol.  As reflected in the jury's verdict form (Doc. 162). The
jury found Mr. Tanabe "NOT GUILTY of extortion . . . in that he
did [not] obtain cocaine in exchange for the DUI stops and arrest
of David Bauldry on or about November 2, 2010."  The jury did so
inasmuch as there was no proof (as opposed to merely insufficient
proof) of the conduct underlying that count, namely, the
existence of any cocaine.  Further, as Mr. Tanabe expressed
during his January 13, 2014 interview with probation, he
adamantly denies requesting or receiving cocaine or ever using
cocaine after 1981.

And as Mr. Tanabe notes in his Acceptance of Responsibility letter (attached as Exhibit 3), "I never engaged in any conduct involving cocaine."  Accordingly, Mr. Tanabe respectfully requests that the BOL should remain at 14 and the two-level enhancement at USSG §2C1.1(b)(1) be removed.

**Para. 28, 34 & 40**:  In light of the above, the adjusted offense level should be no more than **14**.

**Paras. 43:**  For the reasons set forth in the objections to Paragraph 22, all counts group into only one group.  Thus there is no three-level multiple count adjustment.

**Para. 44:**  The combined adjusted offense level should be revised to reflect that it is no more than 14.

**Para. 46:**  Section 3E1.1(a) of the U.S. Sentencing Guidelines provides "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  Further, application note 2 states, in part: "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial."  Mr. Tanabe has

accepted complete responsibility for the conduct that the jury
found him guilty.  See Acceptance of Responsibility Letter
(attached as Exhibit 3)("I accepted a Glock handgun from Chris
Butler. I also made the DUI arrests of Mr. Katz and Mr. Aksu at
Butler's behest. After a lot of reflection I see now that it was
improper.") (Emphasis added).

Mr. Tanabe clearly recognizes that his conduct was wrong and
understands why his conduct is illegal.  His acknowledgement and
shame is plainly reflected in his written statement.  Mr. Tanabe
did not initially discuss his offense on the advice of previous
counsel as there was a possibility of appeal.  His recognition of
illegal conduct did not come easy and once he was able to admit
his conduct to himself and accept responsibility, he wanted to
also let the probation officer and the Court know that he is
ashamed of his role in the arrests of the DUI offenders.  He
wanted to answer any questions and he remains transparent about
his involvement.  His verbal recognition to the probation
officer and his signed statement attached warrants application of
the two-level decrease for acceptance of responsibility.
Accordingly, Mr. Tanabe's acceptance of responsibility decreases
his guidelines calculation by two levels.

While the PSR is unwilling to speculate as to why the jury
found Mr. Tanabe not guilty of taking cocaine as a bribe, it does
speculate as to his motives for now accepting responsibility.
Ms. Tess Lopez, who accompanied Mr. Tanabe to the meeting with

the USPO on January 13, feels that that probation officer may
have misunderstood Mr. Tanabe's comments or may have taken them
out of context.  See Declaration of Tess Lopez, Exhibit 4.
Should the Court not grant the two levels for acceptance, it
should nevertheless take Mr. Tanabe's contrition into
consideration when imposing a below guidelines sentence.

**Para. 47:**  Based on the above, Mr. Tanabe's Final Offense
Level should be no more than 12.

**Para. 84:**  The cash flow is incorrect.  The listed amount of
$2,343 apparently is based on Mr. Tanabe's wife's gross income,
and not her net, after tax, expenses, etc. income.  Accordingly,
Mr. Tanabe's actual positive cash flow is less than $400.  The
PSR makes much of the fact that her income is not verified by a
W-2.  It is now attached as Exhibit 5.

**Para. 85:**  In light of the correction to Paragraph 84, Mr.
Tanabe does not have sufficient assets to warrant a fine and
therefore is unable to pay one.  See USSG §5E1.2(a)("The court
shall impose a fine in all cases, except where the defendant
establishes that he is unable to pay and is not likely to become
able to pay any fine.")(Emphasis added).

**Para. 88:**  Consistent with the objection to Paragraph 47,

Mr. Tanabe's final offense level is no greater than 12, which equates to a 10-16 month range in Zone C.

**Paras. 94:**  As Mr. Tanabe's final offense level is 12, the offense level is within Zone C, not Zone D.  Under Zone C, the guideline minimum term of imprisonment is half the bottom of the guideline range, or five months.  <u>See</u> USSG §5C1.1(d)(2).

In summary, the correct guidelines calculation for Mr. Tanabe, wherein all counts of conviction group pursuant to USSG §3D1.2(a)&(b), is as follows:

| Guideline | Description | Offense Level |
|-----------|-------------|---------------|
| 2C1.1(a) | Base Offense Level | 14 |
| 3E1.1 | Acceptance of Responsibility | -2 |
| | Total Adjusted Offense Level | 12 |

Section 3553(a) of Title 18 of the United States Code further provides that the court shall, on considering these factors, impose a sentence that is "sufficient, but not greater than necessary to comply with the purposes set forth" in subsection (a)(2): just (or proportional) punishment, deterrence, protection of the public, and rehabilitation of the defendant.  <u>See</u> 18 U.S.C. § 3553(a).  This is commonly referred to as the principle of parsimony, which provides a Congressionally-imposed

limit on the exercise of judicial sentencing discretion.  <u>See</u>
<u>United States v. Grasso</u>, 724 F.3d 1077, 1095 n.18 (2013).

　　　To be sure, in imposing a parsimonious sentence, a district
court may <i>not</i> presume that the Guideline sentence is the correct
one or even reasonable.  <u>See</u> <u>Nelson v. United States</u>, 555 U.S.
350, 352 (2009).  Indeed, the Guidelines merely provide a "rough
approximation" of an appropriate sentence.  <u>Rita v. United</u>
<u>States</u>, 551 U.S. 338, 350 (2007).  As a matter of law, a
district court in fact is even free to reject <u>any</u> guideline on
policy grounds, <u>see</u>, <u>United States v. Kimbrough</u>, 552 U.S. 85,
101-102 (2007), particularly where (and as discussed in more
detail below) the Sentencing Commission did not, in adopting the
particular guideline, fulfill its "characteristic institutional
role" of basing the range on study, expertise, empirical data, or
national experience, <u>see</u> <u>id.</u> at 109.

　　　Indeed, as the U.S. Supreme Court recently reiterated, a
district court "'may in appropriate cases impose a non-Guidelines
sentence based on disagreement with the [Sentencing] Commission's
views.'"  <u>Peugh v. United States</u>, _ U.S. _, 113 S. Ct. 2072, 2080
(2013)(quoting <u>Pepper v. United States</u>, 562 U. S. ___, _____,
131 S. Ct. 1229, 1247, 179 L. Ed. 2d 196, 220 (2011)).

　　　Ultimately, the district court must make an independent
determination as to the appropriate sentence, taking into account
the types of sentences available, the relevant § 3553(a) factors,

and the arguments of the parties. <u>See</u> <u>Gall v. United States</u>, 552
U.S. 38, 49-50 (2007).

**C.   USSG §2C1.1 Should Not Be Given Any Significant Weight**

While the correct guidelines calculation is no more than 12,
this Court nevertheless should consider the sentencing practices
of other federal courts across the country when determining
whether to follow the advice of USSG §2C1.1.  As indicated in the
series of figures below, the public corruption and bribery
sentencing guideline at USSG §2C1.1 is being accorded
increasingly less weight by courts across the country.  Courts
are varying below this overly punitive guideline more frequently
and to a greater degree than ever before plainly as a result of
its overly punitive and arbitrary nature.

Using publicly available U.S. Sentencing Commission data,
Figure 1 below illustrates the growing gap between the average
minimum guideline range called for by USSG §2C1.1, and the final
sentence actually imposed.  While the median guideline minimum
has grown from 24 to 37 months from 2007 through 2012, the median
sentence actually imposed has remained steady at 18 months.

**Figure 1**



Comparison of Median Guideline Minimum
and Sentence Imposed Under USSG §2C1.1
Source: U.S. Sentencing Comm'n, *2006-2012 Datafiles (GLMIN - SENTOT0)*

Figure 2 below illustrates the rate of compliance with USSG §2C1.1 by sentencing courts.  Courts are now sentencing within the guideline, i.e., following the advice of the guideline, less than 40% of the time.  Courts are imposing below-USSG §2C1.1 guideline sentences on their own—i.e., not on account of a government motion, but through the exercise of 18 U.S.C. § 3553(a) sentencing discretion—nearly 30% of the time.

Figure 2



**% of Bribery Sentences Within and Below the Advisory Guidelines**

Source: U.S. Sentencing Comm'n, *2006-2012 Sourcebooks of Federal Sentencing,* tbl. 27; *Preliminary Quarterly Data Report, 4th Q. 2013 Release,* tbl. 3.

Legend:
- Within FSG
- Below FSG by Gov't
- Below FSG by Court

Where the impact of courts' increasing frequency of varying downward from USSG §2C1.1 is most striking is in Figure 3 below. This figure compares USSG §2C1.1 offenses denominated "Bribery" to all other major offense categories—Drug Trafficking, Firearms, Fraud and Immigration offenses, which collectively cover well over 80% of all federal offenses.  While the rate of court-initiated downward variances are on the rise for all offenses, Bribery offenses have consistently had the highest court-initiated downward variances rates over all other major offense categories.

Figure 3



**Rate of Non-Gov't Sponsored Below Guidelines Sentences**

Source: U.S. Sentencing Comm'n, *2006-2012 Sourcebooks of Federal Sentencing*, tbl. 27; *Preliminary Quarterly Data Report, 4th Q. 2013 Release,* tbl. 3.

Finally, Figure 4 illustrates the median sentences imposed for all major offense categories including Bribery.  As Figure 4 makes clear a sentence of approximately 10 to 12 months is the norm for sentences imposed under USSG §2C1.1.  In contrast, a 37 month sentence, as called for by the PSR, is over three times greater than the median USSG §2C1.1 sentence, and far greater than the overall median sentence imposed for all federal offenses.  A 37 month sentence is closer to a drug trafficking or firearm sentence than a typical public corruption sentence.  Indeed, it is nearly equivalent to the median sentence for

manslaugter.  See U.S. Sentencing Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl. 13 (reporting the median sentence for manslaughter offenses at 46 months).

**Figure 4**



### Median Federal Sentences for Major Offense Categories

Source: U.S. Sentencing Comm'n, *2006-2013 Sourcebooks of Federal Sentencing*, tbl. 13

**D.   Factors That May Warrant A Sentence Below The Advisory Guideline Range**

This Court, in particular, is uniquely well aware a sentencing judge is required to consider the following purposes of sentencing in accordance with 18 U.S.C. § 3553(a):  (1) The nature and circumstances of the offense and the personal history and characteristics of the defendant; 2) The need for the

sentence imposed to reflect (A) the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) The kinds of sentences available; (4) The guidelines and (5) policy statements; (6) The need to avoid unwanted sentencing disparities; and (7) The need to pay restitution to victim.

First, with respect to the nature and circumstances of the offense, as noted in Mr. Tanabe's written statement (Exhibit 3) and verbal comments to the probation officer, he adamantly denies having received cocaine in exchange for making a DUI arrest.   He did not request nor receive cocaine from anyone.   As noted in our objections, many of Mr. Butler's and Ms. Simm's allegations and statements have been contradicted by other evidence or were simply not credible.   To be sure, Mr. Tanabe does not deny his wrongdoing.   Rather, he rejected what we have been informed was a six month split sentence and went to trial on the charges because he felt the government was accusing him of things he did not do (e.g., the cocaine) and was exaggerating his conduct with outrageous allegations.   In fact, at the time, he did not believe he violated the law at all.

After much discussion with newly retained counsel and

mitigation specialist Tess Lopez and further introspection, Mr. Tanabe finally has acknowledged that he had a reasonable expectation that if he arrested these DUI violators who were in fact guilty, he would make Butler look good to his clients and Butler would feel indebted to him and give him a Glock handgun. Mr. Tanabe had wanted to purchase a Glock and knew that Butler was given 10 free Glocks as a gift.   Since Butler never agreed to actually give him a Glock for any particular arrest nor did he agree to give him a Glock at all, Mr. Tanabe deluded himself into thinking he was not breaking the law.   Mr. Tanabe also had difficulty accepting his wrongdoing because he would have arrested the DUI violators anyway because that was his job, he strongly believed in protecting the public from dangerously impaired drivers, and his police department demanded a high number of monthly DUI arrests.

Mr. Tanabe finally admitted that even though there was no agreement for Butler to give him a Glock, he had a reasonable expectation that Butler would give him a Glock in exchange for his arrests, which is in fact what occurred.   He knows that he should never have expected a gun or anything else in return for doing his job, a job for which he was compensated.   He acknowledges that he violated the public trust and this realization has served as his own private punishment.   He is deeply ashamed of this conduct and the aberration from the normal, ethical manner in which he has lived his previous 49

years.  Mr. Tanabe was truly invested in upholding the law and he was proud of his role as a police officer in assuring that others upheld the law as well.  Mr. Tanabe was on the fast track at the Contra Costa Sheriff's Office.  He has now effectively eliminated any possibility to achieve his life-long dream of advancing through his career as a police officer.

Second, with respect to deterrence, in light of his felony conviction, Mr. Tanabe will certainly never be able to work as a law enforcement officer again.  He will not be in a position to ever again violate the public's trust.  Moreover, he is ashamed and devastated by his conduct and he has learned from this costly mistake.  He has lost his life-long career and sustained a felony conviction, two quite devastating blows to this man who has lived his life through the principles of honesty and integrity instilled by his parents.

Third, with respect to recidivism, a new report was released on January 13, 2013, entitled, *Recidivism of Offenders on Federal Community Supervision*.  See Exhibit 6.  The report, funded by the Department of Justice, identifies several factors that can increase or decrease a person's risk of committing a new offense or being revoked during their period of supervision. Factors that increase risk include criminal history, gender, race, drug abuse problems, mental health issues, unemployment and the need for financial help, housing, and transportation.  Factors that decrease risk include having a strong social support system,

marketable educational and vocational skills, motivation to change and age.

Mr. Tanabe has none of the factors that increase risk and all of the factors that decrease risk. Mr. Tanabe has lived his life with the utmost respect for the law, except for this case, assuring that others uphold the law, and the Court should consider his entire lifetime, not just the time period during which he made a mistake and committed this offense.    Mr. Tanabe has learned from this illegal conduct. He is truly remorseful and will never be in a position to recidivate.

Fourth, there is no need to protect the public from Mr. Tanabe.  Rather, he has otherwise demonstrated through his previous 49 years that he is an asset to society.  He has volunteered his time in the community and if permitted to do as part of his sentence, will continue to do so. Even if not mandated, he will do so.  He has taken his young son to retirement homes and convalescent hospitals to give small gifts to the elderly at Christmas time to teach him that Christmas is about giving something of yourself, not just about receiving gifts.  Mr. Tanabe has volunteered his time to teach martial arts in a structured class for children in his neighborhood.

The advisory guidelines in this case provide a sentence in Zone C, 10 to 16 months.  With simply a one level decrease, his advisory sentence would be in Zone B allowing for probation with a condition that he serve 8-14 months on home confinement.  The

latest figure from the Bureau of Prisons reflects that federal institutions are at 38% overcapacity and growing. At a time when lawmakers are trying to enact changes to mandatory minimum penalties and to reduce or eliminate incarceration for non-violent offenders, incarcerating Mr. Tanabe is counterproductive to these efforts and such a sentence is greater than necessary. In fact, the guideline minimum of 37 months as calculated in the PSR would cost the public fisc nearly $90,000, see PSR at 20, ¶ 98, whereas eight months' of home confinement would cost less than $2,400 or a mere 2.6% of the cost of a 37-month custodial sentence. See id.

Mr. Tanabe's offense, while a crime, is nevertheless an extremely unusual public corruption case inasmuch as the "heartland" case involves far more consideration than the de minimis value of the Glock handgun, the "official act"—arresting indisputably drunk individuals on DUI charges—actually was warranted and required by law, and the same act may have in fact saved lives. To impose a sentence on Mr. Tanabe as if he had engaged in long-term graft in exchange for performing illegal acts simply is unwarranted. Moreover, as stated above, when compared with other police misconduct (assaulting citizens, planting evidence, coercing wrongful involuntary confessions, perjury, etc.), it pales in comparison.

Finally, inasmuch as Mr. Tanabe is a police officer, any custodial sentence likely will place him in a BOP facility far

from home.  As nationally recognized authority on BOP placement and former BOP Western Region Designator J. Michael Henderson notes, "[b]ecause of Mr. Tanabe's extensive employment history in law enforcement, as an officer with multiple law enforcement agencies which spanned an extended period of time, there is a possibility that the . . . [BOP] could designate him to an institution outside of his home state of California, in an effort to lessen any likelihood of conflict with other inmates who are from California and Hawaii." See Memorandum of J. Michael Henderson (Exhibit 7). As Mr. Henderson further notes, not surprisingly, "prison inmates do not like other offenders who are former law enforcement officers." Id.

Thus, Mr. Tanabe will be unusually susceptible to abuse in prison.  A downward variance thus is warranted inasmuch as any time he does serve, will be far more onerous than other offenders given he likely will be placed far from his family and young children, and the risk of being targeted by other inmates necessarily is higher than for those who are not police officers.

While often over-looked, the Commission is charged by Congress to take into consideration the capacity of the Bureau of Prisons when amending and promulgating guidelines.  See 28 U.S.C. § 944(g)("The Commission, in promulgating guidelines . . . shall take into account the nature and capacity of the penal, correctional, and other facilities and services available. . . . The sentencing guidelines prescribed under this chapter shall be

formulated to minimize the likelihood that the Federal prison
population will exceed the capacity of the Federal prisons, as
determined by the Commission."). Last year, the Commission held
hearings on the continuing impact of Booker v. United States on
federal sentencing practice, which addressed overcapacity
concerns.  See U.S. Sentencing Comm'n, Transcript of Public
Hearing (Feb. 16, 2012).  Testifying at the hearing, Charles
Samuels, Director of the Bureau of Prisons, observed:

> Continuing increases in the inmate population
> pose ongoing challenges for our agency. . . .
> [S]ystemwide the Bureau is operating at 38
> percent over rated capacity. . . .  We
> believe the inmate population will continue
> to increase for the foreseeable future. . . .
> [I]nvestments in robust reentry programs
> today will in later years directly result in
> prison cost savings and yield safer
> communities.  Unfortunately, the levels of
> crowding and an increasing number of inmates
> will limit resources far more and make it
> difficult for the delivery of effective
> recidivism-reducing programming.

Id. at 32-34.

Echoing these concerns, Commissioner and Judge Beryl Howell,
while "very pleased to hear that the Department of Justice wants
to work with us on systematic solutions, and is very cognizant
clearly of the 38 percent overcapacity and what that means for
the rest of the mission of the Department of Justice," was
nevertheless concerned that "the Department of Justice [had yet]
to come forward on the different occasions that the Commission
has offered. . . to come up with mitigating circumstances for us
to deal with to address some of the overseverity or piling on of

guidelines." <u>Id.</u> at 63-64.

Due to the significant chance that Mr. Tanabe will suffer substantial abuse in prison far from home based on the nature of his offense and his occupation, and in light of the onerous conditions of protective custody, a sentence of community confinement followed by home confinement is warranted.  A greater sentence violates the principle of parsimony set for at 18 U.S.C. § 3553(a).

### E.   A Non-Prison Sentence is Sufficient But Not Greater Than Necessary to Fulfill The Statutory Purposes of Sentencing

As examined in detail above, USSG §2C1.1 manifestly is inconsistent with the directives set forth at 18 U.S.C. § 3553(a), which, along with other controversial guidelines such as USSG §2B1.1 and §2G2.2, has led to nothing short of a revolt among the federal judiciary.  Only a diminishing minority of offenders are still sentenced within USSG §2C1.1's advisory range. Courts are rejecting USSG §2C1.1's advice clearly because of the overly punitive nature of that Guideline coupled together with its lack of empirical support.

Should the Court adopt Mr. Tanabe's Guideline calculation, the advisory range would then be 10-16 months.  When courts do impose sentences below USSG §2C1.1's advisory range, the current median number of months of downward variance is 12.  <u>See</u> U.S. Sentencing Comm'n, <u>Preliminary Quarterly Data Report, 4th Q. 2013 Release</u>, tbl. 12.  Accordingly, a downward variance to a term of

probation conditioned on community and home confinement and community service clearly is consistent with both the appropriate guideline calculation, the current nationwide sentencing practice, and indeed, not unprecedented.  From 2007 through 2012, 342 offenders sentenced under USSG §2C1.1 received sentences of straight probation.  <u>See</u> U.S. Sentencing Comm'n, Datafiles FY2007-FY2012.

### CONCLUSION

Mr. Tanabe should be sentenced for his offense with strong consideration for its relative severity and his background**,** lifetime of good deeds and meritorious conduct, but not as if he was a involved in taking significant sums of money in return for making wholly false arrests or concocting evidence.  A non-federal prison sentence, in light of all other factors, is proportionate to the seriousness of his offense, and will otherwise parsimoniously meet the other statutory purposes of sentencing.

WHEREFORE, in light of the above, Mr. Tanabe respectfully asks this honorable Court to impose a sentence of five years' probation conditioned upon service of six months of community confinement in a halfway house followed by six months of home confinement with electronic monitoring and a significant amount of community service and any other appropriate conditions.

RESPECTFULLY SUBMITTED,

38

__/s/_____
Alan Ellis
Attorney for Defendant,
Stephen Tanabe

OF COUNSEL:
Mark Allenbaugh

Dated: February 13, 2014

**Certificate of Service**

I hereby certify that on this 13th day of February, 2014, I served by electronic mail a copy of the foregoing Sentencing Memorandum on all attorneys in this matter through the Court's ECF/CM system.

Dated: February 13, 2014

_/s/_____
ALAN ELLIS